**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **GENE B.,[1]** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 7:21-CV-591** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Gene B. ("Gene") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him ineligible for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 42 U.S.C. §§ 1381–1381f. Gene alleges that the Administrative Law Judge ("ALJ") erred by failing to properly assess and accommodate his mental impairments and failing to properly consider his subjective allegations. I conclude that the ALJ's decision is supported by substantial evidence. Accordingly, I **RECOMMEND DENYING** Gene's Motion for Summary Judgment (Dkt. 17) and **GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 21).

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence supports the Commissioner's conclusion that Gene is not disabled under the Act. Mastro v. Apfel, 270

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

F.3d 171, 176 (4th Cir. 2001).  This standard of review requires the court to "look[] to an existing administrative record and ask[] whether it contains 'sufficien[t] evidence' to support the [ALJ's] factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted).  "The threshold for such evidentiary sufficiency is not high," Biestek, 139 S. Ct. at 1154, and the final decision of the Commissioner will be affirmed where substantial evidence supports the decision.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Gene filed for DIB and SSI in 2019 and 2020, respectively, claiming that his disability began on April 20, 2008.[2] R. 15.  The state agency denied Gene's claims at the initial and reconsideration levels of administrative review. R. 67–103. ALJ Michael Dennard held a hearing on April 20, 2021, to consider Gene's claims, which included testimony from vocational expert Holly Randall. R. 33–66.  Gene was represented by counsel at the hearing. On May 13, 2021, the ALJ entered his decision considering Gene's claims under the familiar five-step process[3] and denying his claims for benefits. R. 15–28.

---

[2] Gene's date last insured was June 30, 2025; thus, he must show that his disability began on or before this date and existed for twelve continuous months to receive disability insurance benefits. R. 36; U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the

2

The ALJ determined that Gene suffered from the severe impairments of neurodevelopment disorder, depressive disorder, anxiety disorder and attention-deficit/hyperactivity disorder ("ADHD"). R. 18. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 18–20.  The ALJ concluded that Gene retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following non-exertional limitations: perform simple, routine, tasks with simple, short instructions and simple work-related decisions for 2-hour segments; require a low stress work environment, defined as a work environment with only occasional workplace changes and that does not require the claimant to perform tasks in which others rely on the timely performance of his work; occasional interaction with supervisors, coworkers and the public; will be off task 5% of the time in an eight-hour workday, in addition to normal breaks; and will be absent one day per month. R. 20.

The ALJ determined that Gene is unable to perform his past relevant work of lude tender, pattern cutter, general warehouse worker, forklift operator and machine stuffer, but that he could perform jobs that exist in significant numbers in the national economy, such as marker, photocopier machine operator, and order caller. R. 28. Thus, the ALJ concluded that Gene was not disabled. Id. Gene appealed the decision and on July 15, 2021, the Appeals Council denied his request for review. R. 1–6.  This appeal followed.

---

Commissioner to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## ANALYSIS

I.    **Medical History and ALJ Decision[4]**

a.  **Mental Impairments**

Gene did not graduate from high school or receive a GED. R. 43. Gene visited his primary care physician in April 2013, and complained of depression for the past four to five months after a breakup and moving back to his family home.  Kimberly Reburn, LPN, noted that Gene seemed to have trouble focusing and "gets anger[sic] and upset." R. 352.  Gene noted a previous diagnosis for depression but he was not on medication. Ms. Reburn prescribed Wellbutrin. R. 353.

Two years later, in June 2015, Gene followed up with Ms. Reburn for a medication check of his depression. R. 344.  He noted some anxiety, mild depression, irritability and difficulty sleeping at times. He requested a medication change, and was prescribed Trazodone. R. 345.

In January 2017, Gene saw Ms. Reburn for a follow up on his depression and noted that Celexa was helping, but he still gets upset easily at times over simple things. R. 337. Ms. Reburn noted that Gene's depression and anxiety seem reasonably well controlled with medication, but he would like a slightly higher dose. R. 338.

In July 2019, Gene called his family practice noting that he was more depressed overall, that he felt useless, he lost his job years ago and has limited finances. R. 461. Gene reported that Celexa was very helpful for him in the past but was no longer working, and he felt that he was on

---

[4] Gene's assertions of error relate to his mental health diagnoses and treatment; thus, I do not discuss any records or treatment related to his physical impairments in this opinion.

a downward slope with his depression.  Lawrence Carpio, D.O., increased Gene's Celexa

dosage. Id.

Gene followed up with Dr. Carpio in March 2020, and reported feeling like he has

attention-deficit disorder and cannot work. R. 431.  Gene's mood and affect were normal and

appropriate. R. 432. Dr. Carpio diagnosed depression and anxiety, adjusted his medications and

gave him psychiatry resources for his complaints regarding ADHD. R. 433.  A month later, Gene

had a tele-health session with Dr. Carpio and complained of having more depressed mood

episodes and decreased appetite. R. 428.  Dr. Carpio diagnosed uncontrolled depression and

anxiety and adjusted Gene's medications. R. 429.

In June 2020, Gene reported to Dr. Carpio that he recently saw a psychiatrist who

increased his Celexa, advised him to take melatonin for insomnia, and stopped his prescriptions

for Wellbutrin and Elavil. R. 609–11.

Gene followed up with Virginia O'Brien, M.D., with Jefferson Psychiatric Behavioral

Medicine on June 30, 2020, and reported no improvement with his attention, and that the stress

of not having a job, waiting on disability, and fighting with his mom have affected him. He

reported that melatonin did not help his insomnia. Gene scored as likely "ADD" on the ADHD

adult scale. R. 607.  Gene's mental status exam reflected normal speech, "alright" mood, linear

and logical thought processes, fair insight, good judgment, full orientation, intact memory, and

intact cognition, attention and concentration. Id. Dr. O'Brien noted that Gene met criteria for

depression and anxiety, though the anxiety was fairly nonspecific and he minimized some

symptoms.  Dr. O'Brien noted that Gene has a history of behavioral issues at a boy's home

during his youth, so some of his challenging interactions with others may stem from earlier in his

development. Dr. O'Brien was not sure if Gene had ADD, but decided to reassess once his anxiety and depression are better. R. 608.

On July 1, 2020, Gene followed up with his family practitioner and reported that he has not noticed a difference since his Celexa was increased a month ago. R. 603. His mood and affect were normal and he was appropriate in his interactions. R. 605.

Gene followed up by telephone with Dr. O'Brien in July 2020, and reported that he was feeling better and his girlfriend helps keep him calm. R. 595. He was working two days a week, and hadn't gotten upset much. Gene also reported that his concentration improved some. R. 595. Gene's mental status exam was normal. Id. Dr. O'Brien noted that Gene screened positive for ADHD and will start the medication Concerta. R. 596. Gene followed up with Dr. O'Brien in September and October 2020, and reported doing okay with no outbursts or anger issues, and continued complaints of insomnia. R. 645, 655. Gene reported feeling down after a recent break up with his girlfriend. Gene reported that he did not experience low mood routinely or for sustained periods. R. 645. His mental status examinations were unremarkable. R. 646, 656.

**b. Medical Opinions**

On February 4, 2020, Gene was referred to Robert DeLapp, Ph.D., for a consultative evaluation. R. 271. Gene appeared hyperactive and overly animated. Id. Gene reported being diagnosed with ADHD in 2008 but not taking stimulant medication. Gene complained of difficulty getting along with others. R. 272. Gene reported doing warehouse and construction work but that he is constantly losing jobs because he has no tolerance for interactions with other people. Gene reported that he can bathe and dress himself, shop for groceries, make simple change, manage household cleaning and cooking, play video games and ride his bike. R. 273.

Gene's mental status exam reflected cooperative behavior; good eye contact; restless and agitated; spontaneous, logical, but pressured speech; appropriate thought processes; anxious mood; and exaggerated affect. R. 273. Dr. DeLapp diagnosed ADHD and unspecified depressive disorder which Dr. DeLapp suspected was a result of his untreated ADHD.

Dr. DeLapp summarized Gene's functional estimates as:

> Claimant has a history of doing warehouse and construction work but chronically having problems with this because of his untreated ADHD. He has a history of problems maintaining regular attendance at work and working on a consistent basis because of his frustrations secondary to his untreated ADHD. Special supervision would not likely help this. He has a history of problems working a normal workday or work week without interruptions from his untreated ADHD. He has a history of problems getting along with supervisors[,] coworkers and the public because of his untreated ADHD. He has trouble managing the competitive stress of the workplace.

R. 275.

On March 2, 2020, state agency psychologist Joseph Leizer, Ph.D., reviewed Gene's records and determined that he has moderate limitations with the domains of concentration, persistence and pace; social interaction; and adaptation. R. 71. Specifically, Dr. Leizer determined that Gene's ADHD affects his ability to maintain concentration and focus, but he can maintain attention to perform 2–3 step tasks. R. 73. Dr. Leizer also found that due to Gene's ADHD and depression he has irritability and some difficulties interacting with others, but that he would be able to interact with others on an infrequent and superficial basis. R. 74. Dr. Leizer also found that Gene has some limitations in his frustration tolerance but would be able to perform tasks in an environment that does not require strict production quotas or pressures to perform rapidly. Id.

On June 5, 2020, state agency psychologist Jo McClain, Psy.D., reviewed Gene's records and determined that he may have difficulty remembering detailed instructions due to ADHD but

was able to understand and remember short and simple instructions. R. 86. Dr. McClain found

that Gene had moderate limitations with remaining on task and interacting with others due to

ADHD, but that he is able to persist in simple tasks for two-hour blocks to complete a normal

workday/workweek with no more than occasional interruptions from his psychiatric symptoms.

Id. She further determined that Gene had moderate limitations with social interaction but was

able to engage in occasional or brief, direct interactions with the public, supervisors and co-

workers. R. 87.

### c. Administrative Hearing and ALJ Decision

At the administrative hearing, Gene testified that he has trouble getting along with others,

he has problems remembering, adapting and doing multiple things due to his ADHD, and that his

anxiety manifests through his temper. R. 51–52.  Gene testified that he performs chores around

the house but gets distracted, and that he had fights with his supervisors at previous jobs. R. 56–

58.

The ALJ reviewed Gene's testimony and medical records in detail in his opinion. The

ALJ determined that Gene had a moderate limitation with all four of the broad areas of mental

functioning. R. 19.  The ALJ noted that Gene asserted that he experienced anxiety, mood swings,

irritability, lack of focus and motivation, fatigue, difficulty remembering things and adapting to

changes or stress, self-isolation, and difficulty socializing. R. 21. The ALJ found that Gene's

impairments could be expected to cause his alleged symptoms, but that his statements concerning

the intensity, persistence and limiting effects of the symptoms are not entirely consistent with the

medical evidence and other evidence in the record. R. 21.   The ALJ noted that Gene was

diagnosed with predominantly inattentive ADHD, moderate episodic major depressive disorder,

and anxiety disorder. R. 22. The ALJ noted that Gene's mental status examinations were

generally unremarkable, and that other than some hyperactivity and difficulty remaining focused, he exhibited no gross defects with cognition. R. 23. Gene was able to follow instructions and complete assigned tasks, and demonstrated intact memory, appropriate fund of knowledge, average insight and judgment, linear and logical thought processes, and normal thought content. Id. The ALJ noted that Gene had no psychiatric hospitalizations, and did not pursue regular and ongoing psychotherapy or counseling to treat his mental symptoms. Gene's mental health symptoms were generally well-controlled with medication and did not require significant medication changes or adjustments in dosages since the alleged onset date of disability. The ALJ noted Gene's report that medication was helpful and made him feel calmer, and that he did not have a low mood for sustained periods when he was compliant with his medication regimen. Id. The ALJ also noted that Gene's failure to seek or maintain regular treatment suggests that his symptoms and limitations were not as severe as alleged. The ALJ determined that overall, Gene's mental health treatment history shows that the frequency, intensity, and persistence of mental symptoms are not at a level that would keep him from performing all work-related activities. Id.

The ALJ acknowledged that Gene's mental health indicates that he may have some moderate functional difficulties, and determined that Gene retained the mental capacity to perform and carry out simple, routine tasks and instructions, make simple work-related decisions, and maintain concentration, persistence and pace for 2-hour segments in order to complete the tasks. Id. The ALJ determined that Gene required a low stress work environment, defined as a work environment with only occasional workplace changes and does not require the individual to perform tandem work or tasks in which others rely on his timely performance. The ALJ noted, "[t]o address the claimant's difficulties with social interaction, such as his reported

tendency to become frustrated, irritable, and unintentionally offensive to others, he is limited to

only occasional interaction with supervisors, coworkers and the public." R. 23. The ALJ also

found that Gene would be off task 5% of the time in an eight-hour workday and would be absent

one day per month due to his symptoms or treatment.  The ALJ determined that these limitations

are supported by the objective and examination findings in the record, and adequately address

any limitations due to Gene's condition. R. 23.

The ALJ reviewed Gene's reports of daily activities and noted that they are not consistent

with disabling symptoms and limitations.  Specifically, the ALJ noted that Gene reported that he

is able to care for himself and his personal needs without assistance; he cares for his mother;

prepares meals; completes household chores such as laundry, cleaning, vacuuming, caring for his

cats, mowing the lawn, and making minor household repairs. R. 24.  The ALJ noted that Gene

reported going out alone, driving an automobile, riding a bike, managing financing, shopping in

stores, spending time with family and friends, using a computer, playing video games reading,

watching television, and working odd jobs in construction and on cars. The ALJ found that these

daily activities demonstrate a level of functioning above that alleged by Gene, and are consistent

with the restrictions set forth in the residual functional capacity.  R. 24.

The ALJ reviewed the opinions of Drs. Leizer and McClain, and found them persuasive

overall. R. 24–25.  The ALJ noted that the assessments are supported by their narrative disability

determination evaluations and a thorough review of the record, which demonstrates generally

unremarkable mental status and psychiatric findings. The ALJ noted that the assessments are also

consistent with Gene's routine mental health treatment, with Dr. DeLapp's consultative

evaluation, and Gene's reported activities of daily living. The ALJ concluded however, that he

agreed with Dr. McClain that Gene had moderate limitations with following and remembering

instructions and focusing on tasks, rather than Dr. Leizer's finding that Gene had no limitation with understanding, remembering and applying information. R. 25.

The ALJ reviewed Dr. DeLapp's consultative examination report, noted his findings that much of Gene's problems with irritation, frustration, social interaction, concentration, brief episodic depression and low self-esteem are secondary to his untreated ADHD, and that he would be unable to effectively work around other people. Id. The ALJ found that Dr. DeLapp's assessment is supported by Gene's medical history, Dr. DeLapp's "cogent observations during this thorough examination," results from objective data that are consistent with the generally unremarkable mental status and psychiatric findings in the record, and with Dr. Leizer's opinion. The ALJ found the opinion only partially persuasive, however, because it did not provide specific limitations in a function-by-function assessment or a functional a capacity in vocationally relevant terms. R. 26.

## II.    Mental RFC

Gene asserts that the ALJ's analysis of his mental impairments does not comply with SSR 98-8p. Specifically, Gene argues that the ALJ failed to explain how he accommodated his moderate impairments with concentration, persistence or pace and interacting with others. Pl. Br. Summ. J. p. 15.  Gene also argues that the ALJ erred by finding Dr. DeLapp's opinion only "partially persuasive," and that the ALJ should have adopted Dr. DeLapp's work-related restrictions. Id. at p. 17. Gene also asserts that the ALJ did not sufficiently explain why he did not adopt Dr. Leizer's conclusion that Gene should be limited to interaction with others on an "infrequent and superficial basis." Id.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Mascio v. Colvin, 780 F.3d. 632,

636 (4th Cir. 2015). The ALJ "must include a narrative discussion describing how the evidence

supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical

evidence (e.g., daily activities, observations)." SSR 96-8P, 1996 WL 374184, at *7 (S.S.A. July

2, 1996) [5]; Monroe v. Colvin, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must

"build an accurate and logical bridge from the evidence to his conclusion" and holding that

remand was appropriate when the ALJ failed to make "specific findings" about whether the

claimant's limitations would cause him to experience his claimed symptoms during work and if

so, how often).

A function-by-function analysis requires the ALJ to develop an adequate RFC that

accounts for the work activities the claimant can perform given the physical or mental

impairments affecting her ability to work. Importantly, the ALJ must explain the conclusions

reached and explain any record evidence which contradicts the RFC determination. See SSR 96-

8P, 1996 WL 374184, at *7. The ALJ is instructed to cite specific medical facts and non-medical

evidence supporting his conclusion, discuss the individual's ability to perform sustained work

activities in an ordinary work setting on a regular and continuing basis, describe the maximum

amount of each work-related activity the individual can perform, and explain how any material

inconsistencies or ambiguities in the evidence were considered and resolved. Id.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ

does not perform an explicit function-by-function analysis," agreeing instead with the Second

Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity

---

[5] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that
the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding
on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20
C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are
clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" <u>Mascio</u>, 780 F.3d at 636 (citing <u>Cichocki v. Astrue</u>, 729 F.3d 172, 177 (2d Cir. 2013)). "The <u>Mascio</u> Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weightlifting abilities." <u>Newcomb v. Colvin</u>, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D. W. Va. Apr. 29, 2015).

The ALJ determined that Gene had a moderate impairment with interacting with others, noting that he is able to spend time with friends and family, shop in stores, deal appropriately with authority, work odd jobs, and live with others. R. 19. The ALJ also noted that the medical evidence reflected that Gene communicated effectively, behaved normally, had a good rapport with providers, was described as pleasant and cooperative, had good interactions with non-medical staff and appeared comfortable during his appointments. <u>Id.</u> The ALJ recognized that Gene alleged self-isolation and difficulty socializing, but also that Gene's mental status examinations reflected appropriate appearance, good hygiene, polite, pleasant, cooperative, appropriate posture and eye contact, normal speech, behavior, and ability to establish rapport and relate. R. 22–23. The ALJ noted that Gene's mental health symptoms were generally well-controlled with medication, and that he did not seek routine treatment. The ALJ considered Dr. Leizer's opinion that Gene could interact with others on an infrequent and superficial basis, and Dr. McClain's opinion that Gene could engage in occasional or brief direct interactions with the public, supervisors, and co-workers. R. 25. The ALJ considered Dr. DeLapp's opinion that Gene would be unable to effectively work around other people. The ALJ found Drs. Leizer and McClain's opinions persuasive, and Dr. DeLapp's opinion partially persuasive (R. 25–26), and

considering those opinions along with all of the evidence in the record, determined that Gene

could perform work with occasional interaction with supervisors, co-workers and the public.

R. 20.

The ALJ examined the evidence relating to Gene's social interaction impairment in

detail, explained that the objective evidence and Gene's reported daily activities were not fully

consistent with Gene's report of disabling symptoms, explained how the reviewing and

consultative physician' opinions were considered, and arrived at detailed accommodations for

Gene's impairment. Thus, the ALJ provided the required explanation and the logical bridge for

this court to review his determination regarding Gene's moderate impairment with social

functioning. Further, the ALJ's conclusion that Dr. Lezier's opinion was persuasive did not

obligate the ALJ to adopt wholesale each of Dr. Leizer's individual findings. "[A]n ALJ does not

have to articulate, or expressly state, his reasoning regarding each opinion or finding from every

medical source." Angela U. v. Kijakazi, No. 2:22-cv-34, 2022 WL 3207455, at *9 (E.D. Va.,

July 19, 2022) (quoting Godfrey v. Kijakazi, No. CV 6:20-2504, 2021 WL 8014681, at *7

(D.S.C. Sept. 10, 2021).

Regarding the domain of concentration, persistence, or maintaining pace, the ALJ

determined that Gene had a moderate impairment; that he reported being able to prepare meals,

complete household chores, drive, manage funds, handle his own medical care, read, watch

television, play games, complete woodworking projects and minor household repairs, and work

on cars. R. 19. The ALJ noted records reflecting Gene's logical, goal-directed thought process,

and that he was able to follow his treatment providers' recommendations. The ALJ recognized

that Gene was overly active and inattentive at times, but that he was able to complete testing

assessing his concentration and focus. Id.  The ALJ reviewed Gene's complaints of difficulty

with memory and concentration; his diagnosis of predominantly inattentive ADHD; his ability to follow instructions and complete assigned tasks on mental status exams; and his report that medication helped him feel calmer. R. 21–23.  The ALJ reviewed and found persuasive the opinions of Drs. Leizer and McClain that Gene could perform 2–3 step tasks in an environment that does not require strict production quotas or pressures to perform rapidly, and complete a normal workday/workweek with no more than occasional interruptions from his psychiatric symptoms. R. 24–25. The ALJ noted Dr. DeLapp's finding that much of Gene's problems are secondary to his untreated ADHD. R. 25. The ALJ determined that Gene's impairment with concentration, persistence and pace required accommodations of simple, routine tasks with simple, short instructions and simple work-related decisions for 2-hour segments; and a low stress work environment, with only occasional workplace changes and that does not require Gene to perform tasks in which others rely on his timely performance. R. 20.  The ALJ also found that Gene would be off task 5% of an eight-hour day. R. 23.

Gene asserts broad, non-specific claims that the ALJ's decision fails to properly account for his moderate impairments with concentration, persistence or pace, and fails to include the necessary explanation and "logical bridge" between the evidence and ALJ's decision.  I disagree. Contrary to Gene's assertion, the ALJ explained his reasoning and the RFC in detail, including specific references to the medical records and opinions. The ALJ considered Gene's mental health complaints, his mental health treatment records, his generally normal mental status exams, his activities, and the physician opinions in the record. The ALJ provided detailed accommodations for Gene's impairments with concentration, persistence or pace in the RFC, and explained how the accommodations related to his limitations. Thus, the ALJ provided the required explanation and the logical bridge for this court to review his decision.

### III.    Consultative Opinion

Gene asserts that the ALJ erred by finding Dr. DeLapp's opinion "partially persuasive," and that the ALJ's reasoning for this conclusion is not supported by substantial evidence.  Pl. Br. Summ. J. p. 17. Gene asserts that Dr. DeLapp outlined Gene's work-related restrictions and limitations, and his opinions are supported by his testing during the consultative examination and his observations of Gene. Id.

When making an RFC assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). In evaluating the persuasiveness of medical opinions, the most important factors considered are supportability and consistency. Id.  "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the three factors. [6] Green v. Saul, No. 5:20-cv-1301-KDW, 2021 WL 1976378, at *6 (D.S.C. May 18, 2021). However, when "medical opinions or prior administrative medical findings about the same issue are equally well–

---

[6] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well–supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including:  the medical source's relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3).

supported . . . and consistent with the record," the Commissioner will articulate how he considered the following factors: the medical source's relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3).

Here, the ALJ referenced the appropriate regulations in his analysis and considered the supportability and consistency of Dr. DeLapp's opinion. The ALJ found that Dr. DeLapp's opinion was based on Gene's "medical history, cogent observations during this thorough examination, and results of relevant objective data that are consistent with the generally unremarkable mental status and psychiatric findings in the record, as well as Dr. Leizer's review findings discussed above." R. 25. Thus, the ALJ noted the basis and support for Dr. DeLapp's opinion, and found that it was consistent with Gene's mental status reports, his treatment records, and Dr. Leizer's opinion. The ALJ also noted, however, that Dr. DeLapp's assessment provided "no specific limitations in regards to a function-by-function assessment or functional capacity in vocationally relevant terms." R. 26. Thus, the ALJ considered the opinion to be only partially persuasive.

Indeed, Dr. DeLapp's report lists Gene's "Functional Estimates" as:

Claimant has a history of doing warehouse and construction work but chronically having problems with this because of his untreated ADHD. He has a history of problems maintaining regular attendance at work and working on a consistent basis because of his frustrations secondary to his untreated ADHD. Special supervision would not likely help this. He has a history of problems working a normal workday or work week without interruptions from his untreated ADHD. He has a history of problems getting along with supervisors[,] coworkers and the public because of his untreated ADHD. He has trouble managing the competitive stress of the workplace.

R. 275. As the ALJ noted, Dr. DeLapp's "functional estimates" simply identify Gene's history of difficulties with maintaining regular attendance at work; working on a consistent basis;

working a normal workday or work week without interruptions; getting along with supervisors, coworkers and the public; and managing competitive stress of the workplace. Dr. DeLapp does not provide an opinion as to how those limitations impact Gene's functional work abilities. He does not address whether Gene is capable of performing work with accommodations, despite his mental limitations.

Thus, the ALJ appropriately considered Dr. DeLapp's opinion in detail, described why he found it to be supported by and consistent with the record, and also explained why he found Dr. DeLapp's conclusions only partially persuasive. The ALJ's explanation established the required logical bridge from the evidence to his conclusion. R. 25–26.  Gene's disagreement with the ALJ's analysis of Dr. DeLapp's opinion does not deprive the ALJ's conclusion of substantial evidence.

### IV.    Subjective Allegations

Gene argues that the ALJ's assessment of his allegations is not supported by substantial evidence. Pl. Br. Summ. J. p. 19–23. Gene takes issue with the ALJ's reliance upon his ability to perform a variety of daily activities without qualifying the extent to which he can perform those activities, and argues that the ALJ mischaracterized and minimized the evidence.

 Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain. Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work.

Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id. (emphasis added). "At this step, objective evidence is *not* required to find the claimant disabled." Arakas v. Comm'r, 983 F.3d 83, 95 (4th Cir. 2020) (citing SSR 16-3p, 2016 WL 1119029, at *4–5). SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Here, the ALJ considered Gene's allegations of symptoms, and found that his impairments could reasonably be expected to cause his alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of those symptoms are not fully supported. R. 21. The ALJ supported this conclusion with a narrative discussion of Gene's mental health diagnoses and treatment history; his generally unremarkable mental status examinations; his lack of hospitalizations or regular and ongoing psychotherapy or counseling; his routine and conservative mental health treatment; that his mental health symptoms were generally well controlled with medication; and his failure to maintain regular mental health treatment. R. 21–23. The ALJ also considered Gene's reports of activities of daily living and found that they are not consistent with disabling symptoms and limitations. R. 24. Specifically, the ALJ noted that Gene reported that he is able to care for himself and his personal needs without assistance; he cares for his mother; prepares meals; completes household chores such as

laundry, cleaning, vacuuming, caring for his cats, mowing the lawn, and making minor household repairs. R. 24.  The ALJ noted that Gene reported going out alone, driving an automobile, riding a bike, managing financing, shopping in stores, spending time with family and friends, using a computer, playing video games, reading, watching television, and working odd jobs in construction and on cars. The ALJ found that these daily activities demonstrate a level of functioning above that alleged by Gene, and are consistent with restrictions set forth in the residual functional capacity.  R. 24.  The ALJ also considered the opinions of the reviewing and consultative physicians, found them persuasive and partially persuasive, respectively, and arrived at a detailed and limited RFC that Gene can perform.

Gene asserts that the ALJ failed to qualify the extent to which he performed daily activities and failed to acknowledge that he performs daily activities intermittently at his own pace, citing to Arakas v. Comm'r, and Brown v. Commissioner, 873 F.3d 251 (4th Cir. 2017) for the proposition that an ALJ may not consider the type of activities a claimant can perform without also considering the extent to which he can perform them. Id. This is not a situation like Brown v. Comm'r, where the ALJ overly relied upon minimal daily activities in evaluating the claimant's subjective complaints. Here, the ALJ made minimal references to Gene's daily activities, noting his reported activities and concluding that they "demonstrate a level of functioning above that alleged, and are consistent with the above stated residual functional capacity." R. 24.

The regulations specifically provide that an ALJ may consider a claimant's daily activities, among other factors, in determining the extent to which a claimant's symptoms limit his capacity for work. See 20 C.F.R. § 404.1529(c). Here, the ALJ appropriately considered Gene's reported daily activities. The ALJ did not ignore evidence limiting these activities or

use them as a basis for his conclusion that Gene can perform work.  Rather, the ALJ considered

Gene's activities together with his mental health treatment evidence and physician opinions, as

a means of evaluating the intensity, persistence and limiting effects of Gene's symptoms.  See

Arakas, 983 F.3d at 99 ("In evaluating the intensity, persistence, and limiting effects of a

claimant's symptoms, ALJs may consider the claimant's daily activities.") (citing 20 C.F.R

§ 404.1529(c)(3)(i)).  Thus, the ALJ appropriately considered Gene's activities as one factor in

determining the extent to which symptoms affected his capacity to work.  See e.g. Wooten v.

Berryhill, No. 1:17-CV-190-DCK, 2018 WL 3014412, at *5 (W.D.N.C. June 15, 2018) (noting

that, "[i]nstead of simply equating an ability to perform daily activities with an ability to

[work], the ALJ used evidence of Plaintiff's daily activities as just one factor in his ultimate

RFC determination"); Heyward v. Berryhill, No. 8:16-CV-03003-JMC, 2018 WL 1417526, at

*5 (D.S.C. Mar. 21, 2018) (finding that the ALJ did not err in considering plaintiff's activities

of daily living, as 20 C.F.R. § 404.1529(c)(3)(i) provides that "claimant's daily activities is one

factor the ALJ will consider when evaluating a claimant's symptoms, including pain").

A reviewing court gives great weight to the ALJ's assessment of a claimant's subjective

statements and should not interfere with that assessment where the evidence in the record

supports the ALJ's conclusions.  See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984).

Further, a reviewing court will defer to the ALJ's credibility finding except in those

"exceptional" cases where the determination is unclear, unreasonable, contradicts other findings

of fact, or is based on an inadequate reason or no reason at all.  See Bishop v. Comm'r of Soc.

Sec., 583 Fed. Appx. 65, 68 (D. Md. May 4, 2016) (citing Edeco, Inc. v. NLRB, 132 F.3d 1007,

1011 (4th Cir. 1997)). The ALJ's opinion was thorough and applied the proper legal standard,

and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis

of Gene's subjective complaints with substantial evidence.

## **CONCLUSION**

For the foregoing reasons, I **RECOMMEND AFFIRMING** the final decision of the

Commissioner, **GRANTING** summary judgment to the Commissioner, **DENYING** Gene's

motion for summary judgment and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Elizabeth K. Dillon, United

States District Judge, and to provide copies of this Report and Recommendation to counsel of

record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any

objections to this Report and Recommendation which must be filed within fourteen (14) days

hereof.  Any adjudication of fact or conclusion of law rendered herein by me that is not

specifically objected to within the period prescribed by law may become conclusive upon the

parties.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual

recitations or findings as well as to the conclusion reached by me may be construed by any

reviewing court as a waiver of such objections, including a waiver of the right to appeal.

Entered: January 3, 2023

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge